# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 12, 2011 Session

## STATE OF TENNESSEE v. SHANTA JONES

**Appeal from the Circuit Court for Madison County**
**No. 09205   Donald H. Allen, Judge**

---

**No. W2010-01081-CCA-R3-CD  - Filed November 4, 2011**

---

The Defendant, Shanta Jones, was convicted by a Madison County Circuit Court jury of facilitation of aggravated robbery, a Class C felony; facilitation of aggravated burglary, a Class D felony; facilitation of aggravated assault, a Class D felony; and retaliation for past action, a Class E felony.  See T.C.A. §§ 39-11-403 (2010), 39-13-402 (2010), 39-14-403 (2010), 39-13-102 (Supp. 2009) (amended 2010), 39-16-510 (2010).   The trial court sentenced the Defendant as a Range I, standard offender to six years for facilitation of aggravated robbery, to four years each for the burglary and assault convictions, and to two years for retaliation for past action, to be served concurrently.  On appeal, the Defendant contends that the evidence was insufficient to support her convictions.   We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which THOMAS T. WOODALL AND NORMA MCGEE OGLE, JJ., joined.

David W. Camp, Jackson, Tennessee, for the appellant, Shanta Jones.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; James G. Woodall, District Attorney General; and Shaun A. Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to a home invasion during which the victim, Jerry Kinnie, was injured by two assailants.  At the trial, Mr. Kinnie testified that he had known the Defendant for a few years and that he had only seen but not known her co-defendant, Larry Mallard, Jr.,

until the night of the home invasion. He said that on December 24, 2008, he was alone in his apartment located on Lincoln Street. He said he spoke with the Defendant on the telephone that evening around 11:00 p.m., but did not remember who initiated the call. He said the Defendant mentioned that she needed money and that she believed he had a stimulus check, which he denied having. He said he did not tell the Defendant that he had $140 in cash in his pocket that night. He stated that the Defendant said she was going to come to his home and that about thirty minutes to an hour later, he heard a knock on his door. He said he looked out his side window, saw the Defendant, and unlocked the door. He said he also saw a "beige brown Intrepid" that she borrowed. He said that before he could open the door, Mallard pushed it open and pointed a shotgun at him. He said that another man accompanied Mallard and that the other man grabbed him from behind. He said he did not get a good look at the other man because the man remained behind him and held his neck and arms.

Mr. Kinnie testified that Mallard hit him in the face, walked to his bedroom, searched through the drawers, and returned asking, "Where's the damn money? I know you've got that damn money." He said that he denied having any money and that the man punched him in the face and threatened to kill him unless he gave the man the money. Mr. Kinnie did not remember what happened next but said he was able to walk or crawl to his sister's home, which was located one street from his home. He did not remember the police coming to his sister's home, speaking with the police, or being transported to the hospital in an ambulance. He said his next memory was of being in the hospital the next day. He said his nose was fractured, his neck was injured, and his face was bleeding and bruised. He did not remember speaking with the police at the hospital.

Mr. Kinnie testified that when he was released from the hospital the next day, he returned home and found blood all over the kitchen walls and on the floor. He said the portions of the attack that he could remember occurred in his kitchen. He said $140 and his cell phone were missing after the home invasion. He said that he did not consent to anyone entering his home before the attack and that he thought the intruders were going to kill him. He said the Defendant did not enter his home. He spoke with Jackson Police Investigator Danielle Jones and told her of the telephone calls with the Defendant and the subsequent home invasion. He said he also testified about the incident during proceedings at the Jackson City Court.

Mr. Kinnie testified that on February 13, 2009, he was approached by the Defendant as he stood outside Mildred Corbitt's home. He said he was standing in the front yard and speaking with Ms. Corbitt, his stepdaughter, and Farris Kidd when the Defendant and another person drove by in a truck. He said the truck turned around, stopped near him, and the Defendant stated, "It ain't over. I'm still going to get you." He said the Defendant did not get out of the truck near the home or approach him. He said that he felt threatened by the

statement and that he called the police and reported the incident. He said the incident occurred after he testified in the Jackson City Court.

On cross-examination, Mr. Kinnie agreed that someone knocked on his back door a short time after he spoke with the Defendant on the telephone. He said he was preparing for bed when he heard the knock. He agreed that it was dark outside, that the only light that was turned on at the time was in the bathroom, and that there were no lights outside except for a street light. He said that the bathroom was next to the kitchen and that light from the bathroom lit the kitchen. He agreed that he had only seen Mallard a couple of times in passing before the incident and that he had no previous problems with Mallard. He agreed the two men ransacked his home and said they pulled out his dresser drawers and lifted his mattress. He did not see how the men arrived at his home and did not see the license plate of the car he saw in his driveway. He did not know when he left his home or how he got to his sister's home. He said that his sister told him the police came to her home and spoke with him after the attack but that he did not remember speaking with the police or telling them that he was attacked by two unknown males. He agreed that if the officer wrote down that he stated that two unknown males attacked him, he probably made the statement. He agreed that the first time he said that Mallard was one of the attackers was when he spoke with Investigator Jones about a week later.

Mr. Kinnie testified that he did not remember what Mallard and the other man wore, but he thought the men wore hooded sweatshirts with the hoods pulled over their heads. He said Mallard stated, "Stop looking at me in my face. I'll kill you right now." He did not know if he told Investigator Jones about Mallard telling him not to look at Mallard's face. He agreed that he did not see Mallard when he heard the knock on his back door and looked out the window.

Mr. Kinnie testified that he never drank alcohol or used illegal drugs. He disagreed that the home invasion was the result of a drug-related debt.

Mr. Kinnie testified that the first time he saw Mallard was when Mallard came through the door. He denied that he previously testified that he saw Mallard through the window. He agreed that he did not remember going to his sister's home after the attack and that $140 was taken from his pocket during the attack.

Mr. Kinnie testified that he could not pinpoint the time when the attack occurred but agreed that if he previously testified that the attack occurred around 11:30 p.m. or midnight, it occurred at that time. He said he spoke with the Defendant three or four times on December 24, 2008. He said that although he could not remember her telephone number or the number of the phone he used at the time, he knew her number at the time of the attack

and recognized her number when she called. He agreed the Defendant asked him about a stimulus check but said she did not tell him why she was interested in the check. He agreed he told the Defendant he did not have a stimulus check. He said the Defendant told him she would come to his home after she finished styling someone's hair. He agreed he did not mention in previous testimony that the Defendant told him she would come to his home after she finished styling the person's hair. He agreed he did not have telephone records verifying the calls with the Defendant.

Mr. Kinnie agreed that the Defendant drove a brown Intrepid on the night of the attack and that when he was asked during a preliminary hearing what kind of car the Defendant and the attackers drove, he said she drove a white Ford Taurus. He said that the Defendant owned a white Taurus but that she borrowed a brown Intrepid from a friend on the night of the attack.

Mr. Kinnie testified that Ms. Corbitt was the mother of his daughter, that Latanza Kidd was his stepdaughter, and that Farris Kidd was his stepdaughter's ex-husband. He said that he did not know if Ms. Corbitt and Mr. Kidd had problems with the Defendant's family and that he was not aware of any problems between the families. He said that when the Defendant drove by Ms. Corbitt's home, the Defendant told him that "it wasn't over" and that "she was still going to do what she was going to do."

Mr. Kinnie testified that he did not have lights on outside his home before the attack and that he did not turn outdoor lights on when he heard the knock on his door. He agreed that a street light near his home was on. He said that it took him about one minute to unlock his door after he heard the knock and that he saw the intruders as they pushed open his door with a shotgun. He said he looked out the window before he unlocked the door and saw the Defendant. He said he recognized the Defendant's voice when he asked who was at the door and she responded, "Me. Open the door." He said the Defendant did not state her name when responding, and he denied that seeing the brown Intrepid made him assume that the Defendant was also outside. He said the Defendant did not enter his home.

Mr. Kinnie testified that he did not know the Defendant was six months pregnant on December 24, 2008. He said he did not notice if she was pregnant on the night of the attack or when she threatened him on February 13, 2009. He said that although the Defendant got out the passenger side of the truck at one point, she did so "way down" at the end of the street near a bus stop.

On redirect examination, Mr. Kinnie testified that he was in his bedroom when he heard the knock on his door on December 24, 2008. He said the knock occurred about an hour after he last spoke with the Defendant on the telephone. He said that he looked out the

-4-

window before unlocking the door and saw "a girl that looked like Shanta." He said the voice also sounded like the Defendant. He said that he saw a brown Intrepid in his driveway and that he had seen the Defendant drive the car numerous times. He said that after he saw the Defendant through the window and unlocked the door, he did not see the Defendant again.

Mr. Kinnie testified that on February 13, 2009, the Defendant rode in a truck driven by her brother. He said that the truck moved to the end of the street after the Defendant threatened him and that she was about 100 feet away when she got out of the truck.

On recross-examination, Mr. Kinnie agreed that when he looked out the window, he saw the Defendant but not Mallard. He denied testifying at the preliminary hearing that he saw Mallard through the window and said the preliminary hearing record was incorrect. He agreed the only lights on at the time were his bathroom light and street lights. He agreed he did not know the man who came into his home with Mallard. He said Mallard told him, "Don't be looking at me in my face or I'll kill you right now." He denied he testified at the preliminary hearing that the unknown man was the person hitting him while Mallard held his arms. He said the unknown man was the person who held his arms while Mallard hit him. He did not know what Mallard did with the shotgun while hitting him.

Jackson Police Officer James Price testified that at 11:55 p.m. on December 24, 2008, he responded to a call from Mr. Kinnie's sister's home. He said that Mr. Kinnie was bleeding and had several cuts and wounds on his face and that Mr. Kinnie was taken to the hospital in an ambulance. He said that he went to Mr. Kinnie's home to secure the scene and that the kitchen "looked like a storm had hit it." He said he saw items turned over and "blood everywhere." He said another officer photographed the scene. He said he spoke with Mr. Kinnie in the emergency room and obtained a statement.

On cross-examination, Officer Price testified that although he attempted to speak with Mr. Kinnie at his sister's home, he "got very little details because of [Mr. Kinnie's] pain and injuries." He agreed that he spoke with Mr. Kinnie at the hospital and that Mr. Kinnie told him that two unknown black males assaulted him. He agreed Mr. Kinnie did not mention Mallard.

Jackson Police Officer Nicholas Donald testified that at approximately 11:30 p.m. on December 24, 2008, he responded to a call reporting that a man had been injured. He said that Mr. Kinnie was holding his stomach and face, that Mr. Kinnie's face was severely swollen, and that there was a lot of blood. He said that before Mr. Kinnie was taken to the hospital, Mr. Kinnie was able to tell him that someone broke into his home. He said he went to Mr. Kinnie's home and saw blood in the living room, on the window, and coming from

the bedroom. He said he photographed Mr. Kinnie and Mr. Kinnie's home. He identified the photographs and said they showed blood on Mr. Kinnie and in his home. He identified a photograph that showed blood on the outside of Mr. Kinnie's bedroom window and said it appeared that Mr. Kinnie left his home through the window after attempting to leave through the door. He agreed he did not go to the hospital or have any contact with Mr. Kinnie after transferring the case to an investigator.

On cross-examination, Officer Donald testified that Mr. Kinnie was not able to speak clearly while at his sister's home. He said Mr. Kinnie did not indicate how he left his home after the attack. He agreed he went to Mr. Kinnie's home after Mr. Kinnie was taken to the hospital. He said flashlights were used to illuminate the photographs taken in Mr. Kinnie's home because the home was "kind of dim." He did not remember if he turned on lights in the home. He agreed he could not see the street from the Defendant's back door.

Latanza Kidd testified that Mr. Kinnie was her stepfather and that she had known the Defendant for a few years. She said that at about 4:30 p.m. on February 13, 2009, she was at her mother's home with Mr. Kinnie, her mother, and her ex-husband. She said that as they stood in the front yard, a truck drove by, slowed, and the Defendant yelled, "You're going to get yours," to Mr. Kinnie. She said the truck continued to the end of the street and the Defendant got out of the truck and continued to "say some stuff" toward them. She said that they did not pay attention to the Defendant after she left and that she did not know what the Defendant said while at the end of the street. She said the Defendant's brother, Marcus, drove the truck when it stopped in front of her home.

On cross-examination, Ms. Kidd agreed that Ms. Corbitt was her mother and that Ms. Corbitt had a sister named Sandra Rogers. She said Joe Jones was a man who spent time with her father and Ms. Rogers. She did not know that Mr. Jones was the Defendant's grandfather or if he ever dated Ms. Rogers while he was married to the Defendant's grandmother. She said that she never fought with the Defendant's family and that she did not know if her family ever fought with the Defendant's family. When asked if she ever heard of a fight between the families that resulted in the police being called, she responded, "They might have . . . said something about a fight. I don't know." She said the Defendant's statement on February 13, 2009, was targeted at Mr. Kinnie, not one of her family members. She said she knew the Defendant was speaking to Mr. Kinnie because "[t]hat stuff happened years ago. . . I know it wasn't directed at us because we have seen [the Defendant] since then and she never said nothing else about that." She said she was sure the Defendant's brother, Marcus Jones, drove the truck when the Defendant yelled at Mr. Kinnie. When asked if it would surprise her to learn that Marcus Jones was incarcerated in February 2009, she said that he was not an inmate when the Defendant rode by her home and threatened Mr. Kinnie and that she was positive he was not incarcerated because she saw him again later that night.

-6-

Farris Kidd testified that he had a child with Ms. Kidd and that he knew Mr. Kinnie. He did not know the Defendant. He said that on February 13, 2009, he was standing in Ms. Corbitt's front yard when the Defendant rode by in a truck driven by her brother and stated, "I've got something for you." He said the Defendant spoke to Mr. Kinnie, not him. He said he did not speak with the Defendant. He said Mr. Kinnie called the police after the Defendant left.

On cross-examination, Mr. Kidd testified that he was married to Ms. Kidd for six years and that they had been separated for about five years. He knew that Ms. Rogers dated Mr. Jones but did not know how long they dated or if Mr. Jones was married to the Defendant's grandmother while he dated Ms. Rogers. He was not aware of any problems between Ms. Kidd's family and the Defendant's family. He said that four people were present when the Defendant rode by on February 13, 2009, and that the Defendant did not use Mr. Kinnie's name when she stated, "I've got something for you." He said that the statement was not directed at him and that he knew it was directed at Mr. Kinnie because Mr. Kinnie and the Defendant, "had beef." He said he was sure that Marcus Jones drove the truck the Defendant rode in.

On redirect examination, Mr. Kidd testified that the Defendant got out of the truck near a dumpster before getting back into the truck and driving away. On recross-examination, Mr. Kidd testified that he did not notice anything unusual about the Defendant's appearance when she got out of the truck.

Jackson Police Investigator Danielle Jones testified that she worked with the violent crimes unit. She said she began investigating the attack on Mr. Kinnie after the case was assigned to her on December 30, 2008. She said that she spoke with Mr. Kinnie and that he told her the Defendant, Mallard, and an unknown man broke into his home and attacked him on December 24. She did not go to Mr. Kinnie's home, but reviewed photographs of the crime scene. She said that the Defendant and Mallard were arrested and that there was a preliminary hearing in the Jackson City Court on January 29, 2009. She said Mr. Kinnie testified at the hearing.

On cross-examination, Investigator Jones agreed that there was no physical evidence collected at the crime scene. She agreed Mr. Kinnie's statement was the only evidence indicating that Mallard attacked him.

Joe Jones, Jr., testified on behalf of the defense that the Defendant was his niece. He said that on December 24, 2008, he was at his parents' home with the Defendant and the Defendant's mother, who also lived there. He said Joe Taylor, who was the Defendant's friend, was also at the home. He said the Defendant was six months pregnant at the time.

He said that he was home all day and that he did not remember the Defendant leaving the home that day, other than when she drove to the store around 8:00 p.m. and returned about ten minutes later. He said that the Defendant drove a white Chrysler but that her uncle, Quincy, took her car at 10:30 p.m. He said that he went to sleep around 12:30 or 1:00 a.m. and that he saw the Defendant baking cookies before he went to sleep. He said he did not see Mallard that day or that night.

On cross-examination, Mr. Jones testified that both he and the Defendant were at their home all day, other than when the Defendant went to the store at 8:00 p.m. He said about eight family members and friends came to the home that day. He agreed the Defendant's uncle took the Defendant's white car around 10:00 or 10:30 p.m., and he said the car was not returned until the next morning. He said the Defendant was upset that her uncle took her car. On redirect examination, Mr. Jones testified that he was sure the Defendant was at home on December 24, 2008.

Debbie Jones testified that the Defendant was her daughter. She said that on December 24, 2008, she did not have to work and was home all day. She said that the Defendant lived with her and that the Defendant did not leave the house after 8:00 p.m. She said that before 8:00 p.m., the Defendant left the house for about fifteen or thirty minutes to go to the store and that she thought Mr. Taylor drove the Defendant to the store. She said the Defendant did not have a car that night because her uncle was using her white Intrepid. She said that Mr. Taylor was a family friend and that he was at their home that night. She said that she did not see Mallard that night and that she did not see the Defendant with any other male that night. She said Mr. Kinnie's home was about fifteen to twenty minutes away from her home. She said that the Defendant was in her sight or presence between 10:30 p.m. and midnight and that she was positive the Defendant was at home that night. She said that the Defendant was pregnant at the time and that her baby was born on March 2, 2009.

On cross-examination, Debbie Jones testified that "plenty of people" came in and out of her home on December 24, 2008, including her aunt, nieces and nephews, and her grandchildren and their parents. She agreed she was busy cooking that night but said the Defendant was in her sight the entire night. She said she knew the Defendant went to the store before 8:00 p.m. because the Defendant was at home baking cookies around 8:00 or 8:30 p.m. She said the Defendant was not baking cookies at 11:00 p.m.

Debbie Jones testified that she remembered speaking with Investigator Jack Wilson and telling him that she was at a party at her home between 10:00 p.m. and midnight. She said that the Defendant was present during that time and that the Defendant did not have access to her white Intrepid after her uncle took it. She agreed the Defendant's uncle was at their home that night and said he was not in her sight the entire evening. She said she

believed that Mr. Taylor drove the Defendant to the store but did not know what type of car he drove. She agreed that she was not sure what time the Defendant went to the store or what time the Defendant's uncle took her car.

Josephine Jones testified that she was the Defendant's grandmother and that she shared a home with her husband, Joe Jones, Sr., her children, Debbie Jones and Joe Jones, Jr., and the Defendant and the Defendant's two-year-old daughter. She knew Ms. Corbitt and Ms. Rogers and said they were sisters. She said that she was aware her husband had a relationship with Ms. Rogers for nearly nine years and that the relationship was a source of problems. She also knew that Mr. Kinnie and Ms. Corbitt had children together. She agreed that the relationship between her husband and Ms. Rogers caused her family and Ms. Corbitt's family to fight physically and that there was a lot of "bad blood" between the families.

Josephine Jones testified that on December 24, 2008, the Defendant was at home between 10:00 p.m. and midnight. She said the Defendant did not have access to her car at that time because her uncle took her car. She said that no member of her family owned a white Ford Taurus and that a white Taurus was not parked outside her home on December 24. She said Mallard did not visit her home on December 24.

On cross-examination, Josephine Jones testified that she was home all day and that the Defendant arrived before 9:00 p.m. She remembered speaking with an investigator from the District Attorney's Office and said she "may have" told them that the Defendant arrived at her home around 10:00 p.m. and left after midnight. She did not know how the Defendant got to her home or whom she was with when she arrived. She did not know where the Defendant was before arriving home or what time the Defendant realized that her car was missing. She did not know what time the Defendant left the house earlier that day, when the Defendant went to the store to buy ingredients, or who she went to the store with. She said she finished cooking around midnight and the family exchanged gifts. She said she was not sure when people came and left her home that day.

Joe Taylor testified that he was sixty-six years old and that he had been friends with the Defendant and her family for about six years. He said he treated the Defendant like a daughter. He said that on December 24, 2008, he visited the Defendant's home to assemble toys that he and his wife bought for the Defendant's daughter. He said he arrived at the home around 8:00 p.m. and stayed until about 11:00 or 11:30 p.m. He said that he saw the Defendant while he was there and that numerous people visited the home during that time. He said that the Defendant left around 8:00 p.m. to buy ingredients to bake cookies but that she was at home eating cookies when he left. He said he did not see Mallard at the Defendant's home.

Mr. Taylor testified that on December 24, 2008, the Defendant drove a white Dodge Intrepid that he and his wife gave her. He said that the Defendant had never owned a Ford Taurus since he met her and that he had never seen her drive a brown or dark-colored Dodge Intrepid. He said that the Defendant's uncle borrowed her car after she got home from the store and that she did not have access to her car when he left the home.

On cross-examination, Mr. Taylor testified that the Defendant was at her home when he arrived. He agreed that her family was having a Christmas party and that people came in and out of the home frequently. He said he assumed she drove her car when she went to the store because her car was sitting in the driveway when he arrived. He said that he did not return to the Defendant's home after he left and that he did not know who visited the home after he left.

On redirect examination, Mr. Taylor agreed that he testified at the preliminary hearing at which Mr. Kinnie also testified. He said Mr. Kinnie was present when he testified.

Antonio Pewitte testified that Mallard was the brother of his fiancé, Selena Newsome. He said that on December 24, 2008, he was at Ms. Newsome's apartment working on her Red Chevrolet Blazer. He said he began repairing the truck around 5:00 p.m., finished around midnight, and left the apartment complex around 3 a.m. He said that Mallard was at the home and that he was angry with Mallard because Mallard refused to help repair the truck and because Mallard ate the last piece of a cake purchased by Mr. Pewitte. He said that Mallard repeatedly came outside to joke with him and that Mr. Mallard asked to borrow movies. He said Mallard went back and forth between Ms. Newsome's apartment and a neighbor's apartment. Mr. Pewitte said that he went to the neighbor's apartment numerous times to smoke cigarettes, which Ms. Newsome did not allow in her home, and that he saw Mallard in the neighbor's apartment watching the borrowed movies. He said that he was working on the truck in front of the apartments until midnight, that he could hear the neighbor's door open whenever anyone left, and that he never saw Mallard leave the apartment complex.

On cross-examination, Mr. Pewitte testified that he did not live at Ms. Newsome's apartment but that he stayed there frequently. He said that he was at Ms. Newsome's apartment all day but that he began installing a water pump on her truck around 5:00 p.m. He said he saw Mallard each time he went back and forth between Ms. Newsome's apartment and the apartment next door. He agreed that Mallard did not stay outside to help him work on the truck and that he did not know what Mallard did while inside the apartments. He said that each time he went to the neighbor's apartment to smoke, Mallard was there. He agreed that Ms. Newsome's apartment was within walking distance of Lincoln Street.

Upon this evidence, the jury acquitted Mallard but found the Defendant guilty of facilitation of aggravated robbery, facilitation of aggravated burglary, facilitation of aggravated assault, and retaliation for past action. The trial court sentenced the Defendant as a Range I, standard offender to six years' confinement for facilitation of aggravated robbery, to four years each for the burglary and assault convictions, and to two years for retaliation for past action, to be served concurrently. This appeal followed.

The Defendant contends that the evidence was insufficient to support her convictions for facilitation of aggravated robbery, facilitation of aggravated burglary, and facilitation of aggravated assault because the jury found her co-defendant not guilty on all counts. She argues that the same evidence the jury considered insufficient to convict Mallard must also be insufficient to convict her. She contends that the evidence was insufficient to support her conviction for retaliation for past action because there was no evidence that the Defendant directed a statement at the victim or that her statement related to the victim's previous testimony. The State argues that the evidence was sufficient to support the Defendant's convictions. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This means that we may not reweigh the evidence but must presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Pertinent to this appeal, a person facilitates a felony if "knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." T.C.A. § 39-11-403. Robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear" and aggravated robbery is robbery accomplished with a deadly weapon. T.C.A. §§ 39-11-401 (2010), -402(a)(1). A person commits aggravated burglary who, without the effective consent of the property owner, enters a habitation and commits or attempts to commit a felony, theft or assault. T.C.A. §§ 39-14-402 (2010), -403. A person commits aggravated assault who intentionally, knowingly, or recklessly causes bodily injury to another and uses or displays a deadly weapon. T.C.A. §§ 39-13-101 (2009) (amended 2010), -102. "A person commits the offense of retaliation for past action who harms or threatens to harm a witness at an official proceeding . . . or a family member of any such person, by any unlawful act in retaliation for

-11-

anything the witness . . . did in an official capacity as witness . . . ." T.C.A. § 39-16-510. "[A] person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-106(a)(18) (2006) (amended 2009). "[A] person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." T.C.A. § 39-11-106(a)(20). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id.

Taken in the light most favorable to the State, the victim testified that on December 24, 2008, he was alone at his apartment. He spoke with the Defendant on the telephone that evening around 11:00 p.m., and she stated that she needed money, that she believed he had a stimulus check, and that she was going to come to his home. The victim heard a knock on his door about thirty minutes to an hour later, looked out his side window, saw the Defendant, and unlocked the door. He recognized the Defendant's voice when he asked who was at the door and she responded, "Me. Open the door." He said that before he could open the door, Mallard and another man pushed it open, pointed a shotgun at him, held his neck and arms, punched him, and threatened to kill him unless he gave them money. He said the men ransacked his home and asked, "Where's the damn money? I know you've got that damn money." He said that he did not remember what happened after being attacked and that his next memory was of being in the hospital the next day. The victim's nose was fractured, his neck was injured, and his face was bleeding and bruised. He said $140 and his cell phone were missing after the attack. He said that he did not consent to anyone entering his home before the attack and that he thought the intruders were going to kill him. The victim said that he had known the Defendant for a few years but that he had only seen and did not know Mallard until the night of the home invasion. The victim initially told the police that two unknown males attacked him, but a week later he told Investigator Jones that Mallard was one of the attackers. He thought the attackers wore hooded sweatshirts with the hoods pulled over their heads.

Officer Price testified that at 11:55 p.m. on December 24, 2008, he responded to a call from the victim's sister's home. He said that the victim was bleeding and had several cuts and wounds on his face and that the victim was taken to the hospital in an ambulance. He said that he went to the victim's home to secure the scene and that he saw items turned over and "blood everywhere."

The victim testified about the home invasion during the preliminary hearing on January 29, 2009. He said that on February 13, 2009, he was approached by the Defendant as he stood outside of Ms. Corbitt's home. He said the Defendant was in a truck, stopped in front of him, and yelled, "It ain't over. I'm still going to get you." He said that he felt

threatened by the statement and that he called the police and reported the incident. Ms. Kidd testified that at about 4:30 p.m. on February 13, 2009, she was at her mother's home when a truck drove by, slowed, and the Defendant yelled, "You're going to get yours," to the victim. Farris Kidd and Latanza Kidd each said the Defendant's statement was targeted at the victim.

The Defendant argues that the evidence was insufficient because the jury did not convict Mallard and because the evidence did not established that her statement on February 13 was directed at the victim or that it related to his previous testimony at the preliminary hearing. The jury's verdict implicitly accredited the victim's testimony identifying the Defendant and discredited the Defendant's alibi witnesses. Likewise, the jury accredited witness statements that the Defendant threatened to harm the victim two weeks after he testified against her at the preliminary hearing. As noted above, any questions about the credibility of the witnesses were resolved by the jury and we must presume that the trier of fact resolved all conflicts in the testimony and drew all reasonable inferences from the evidence in favor of the State. See Bland, 958 S.W.2d at 659; Cabbage, 571 S.W.2d at 835. The record reflects that the Defendant either organized the home invasion or enabled the attackers to gain entry into the victim's home before he was attacked and robbed at gunpoint. We conclude that a rational trier of fact could have found beyond a reasonable doubt the elements of facilitation of aggravated robbery, facilitation of aggravated burglary, facilitation of aggravated assault, and retaliation for past action. We hold that the evidence is sufficient to support the Defendant's convictions.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON,  PRESIDING JUDGE